UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 18 CR 537 (SHS)

JOHN TORTORA,

Defendant.

------------------------------x

New York, N.Y.
December 14, 2018
2:40 p.m.

Before:

HON. SIDNEY H. STEIN,

District Judge

APPEARANCES

GEOFFREY S. BERMAN,
United States Attorney for the
Southern District of New York
JESSICA FENDER
LAUREN SCHORR
Assistant United States Attorneys

MURRAY RICHMAN
RICHARD WARE LEVITT
Attorneys for Defendant

(Case called)

THE DEPUTY CLERK: Counsel, please state your names for the record.

MS. FENDER: Good afternoon, your Honor. Jessica Fender and Lauren Schorr, on behalf of the government.

THE COURT: Good afternoon.

MR. RICHMAN: Good afternoon, your Honor. Murray Richman, on behalf of the defendant, Richard Tortora.

MR. LEVITT: And Richard Levitt, your Honor. Good afternoon.

THE COURT: Good afternoon.

Now, Mr. Richman, you asked that your client be excused --

MR. RICHMAN: Yes, your Honor.

THE COURT: -- from appearing today, and you said -- which I permitted in the order dated the 11th. The letter from Mr. Levitt is dated the 10th. He says, "We" -- that is, Levitt & Kaiser along with Murray Richman and Anthony Ricco -- "represent Tortora and request that Mr. Tortora's appearance be waived at this conference. We don't believe any substantive issues will be addressed requiring his physical presence. The government does not consent. The government, however, has not yet filed its conflict letter, much less have we responded. Any discussion of its merits is, therefore, premature."

Mr. Tortora is diabetic, and the ardors of transport

for a status conference are, respectfully, unnecessary. When I endorsed that granting Mr. Tortora permission not to be here, I said at the conference defense counsel shall explain how defendant's diabetes is affected by his being transported from Brooklyn to court. So who wants to tell me why he shouldn't be here because he has diabetes?

MR. RICHMAN: Your Honor, it's not simply diabetes. Mr. Tortora has also had a stroke as a result of the diabetes.

THE COURT: When was that?

MR. RICHMAN: Four years ago.

THE COURT: Right.

MR. RICHMAN: And he's disabled because of that, to some extent, memorywise as well.

THE COURT: But he's appeared here before. He was able to respond in the arraignment, I believe. I haven't noticed any impairment.

MR. RICHMAN: Oh, yes, no question about that. But it's 14 hours in transit back and forth and especially in these situations in the afternoon. And they keep him in the downstairs, and he doesn't get to eat, he doesn't get to have anything taken care of, he's taken back, and after 14 hours, he's so disabled, he's just beaten up.

THE COURT: He doesn't get anything to eat for 14 hours?

MR. RICHMAN: They give him a baloney sandwich.

THE COURT: What's the 14 hours?

MR. RICHMAN: That's from the institution in Brooklyn, they bring him over here 6:00 o'clock in the morning, and he's lodged here early in the morning. He misses breakfast, doesn't get breakfast, because he leaves the institution before the breakfast is given. Here, they make arrangements for a sandwich of some kind, then he's here until late in the afternoon, and by the time they get him back, it's, generally speaking, 8:00, 8:30 in the evening. That's the only reason --

THE COURT: You mean the marshals are transporting prisoners at 8:30 in the evening?

MR. RICHMAN: They're unloading them at 8:30 in the evening.

THE COURT: All right.

Government, this is all new to me. Can the government state that, indeed, to its knowledge, that's true, that his coming from the MDC involves a 14-hour journey in which the only food is a baloney sandwich?

MS. FENDER: Your Honor, the government cannot represent that it knows that fact, but I will say that we believe that when prisoners are transported for morning appearances, they are often then transported back much more quickly, they don't wait the entire day. So to the extent that that's the concern, that Mr. Tortora is sitting here for hours awaiting an afternoon court appearance, the government

discussed with defense, and we're happy to try to accommodate that by asking your Honor to set future court appearances in the morning, so that he can go back earlier.

THE COURT: I always have conferences in the morning, to the extent possible. If that is exactly how it works, I'd appreciate it if the government would submit a letter to me, unless you think I should just go directly to the marshals, on what the procedure is in bringing people from the MDC and if, indeed, an afternoon conference means they have to come here early in the morning and stay till late at night and also with what food they're given. If you could that, I'd appreciate it, just so that I know in the future.

MS. FENDER: Of course, your Honor, we'd be happy to do that.

THE COURT: All right.

MR. RICHMAN: I will make sure, your Honor, that Mr. Tortora will be here at any stage of the proceedings, he is not in any way seeking to avoid being here, however --

THE COURT: I thought that's exactly what he was trying to do.

MR. RICHMAN: Only in this situation where it's not essential that he be here, and he's just not feeling well because of it. That's the only reason we raised it, not on a general and complete basis.

THE COURT: All right. I direct you to buy a

transcript and send it to him, so that he knows exactly what happens today in court.

MR. RICHMAN: Thank you, your Honor.

THE COURT: All right. Do that.

It's also come to my attention that there are four counsel here. Mr. Richman, you have made an appearance in August, on August 2nd, Mr. Kaizer made an appearance on September 28th, and Mr. Levitt made an appearance on the same day. That's three counsel, all of whom are retained. Am I correct about that, Mr. Richman?

MR. RICHMAN: Correct, your Honor.

THE COURT: All right.

Now, at some point, this was a capital-eligible case, and, therefore, because I always like to appoint learned counsel pursuant to 18, U.S.C., 3005 at the earliest possible opportunity, I talked with the Federal Defenders, as Section 3005 suggests or mandates, and I appointed Mr. Ricco as learned counsel pursuant to Section 3005, and, in fact, if I remember correctly, Mr. Richman even initiated that.

MR. RICHMAN: Yes, sir.

THE COURT: But I gather that the order of appointment, which is document 11, simply says, "Anthony Ricco, Esq., is appointed as learned counsel pursuant to 18, U.S.C., 3005 to represent defendant."

I gather, since that's pursuant to 3005, that he's

paid by CJA funds, correct? Government, is that right?

MS. FENDER: That's correct, your Honor.

THE COURT: Which it seems to me that there is -- it doesn't make sense -- well, let's go back.

Government, this is no longer a capital case, correct? Main Justice has decided not to pursue the death penalty?

MS. FENDER: That's correct, your Honor. We filed a status update to that effect on November 20th.

THE COURT: Pursuant to United States against Douglas, 525 F.3d 225, that case says: "In any event, we agree with the majority of the federal Courts of Appeals that once the government has formally informed the Court and the defendant of its intention not to seek the death penalty, the matter is no longer a capital case within the meaning of Section 3005, and that section does not require the district court to continue the appointment of a second attorney." Then it goes on: "Our conclusion that Section 3005 does not entitle a defendant to a second attorney under these circumstances would not preclude a district court, in its discretion, from maintaining the dual appointment in a future case out of a concern for fairness in the trial of a criminal offense."

And, indeed, Ms. Fender is correct, document 28, dated November 20, is a notification from the U.S. Attorney that the acting United States Attorney General has authorized and directed the Southern District of New York not to seek the

death penalty against John Tortora, Jr., in this case. It, therefore, seems to me appropriate that I relieve Mr. Ricco because there are three separate retained attorneys in this case, and it's no longer a capital case.

Mr. Richman, what's your position?

MR. LEVITT: Judge, if I may?

THE COURT: Yes.

MR. LEVITT: First, just so the Court understands, Mr. Kaizer and I are partners, so there are two firms that have been retained on Mr. Tortora's behalf. So there aren't three separate attorneys who have been retained, there are two firms that have been retained.

THE COURT: No, but three -- I guess the way I should phrase it is three attorneys have made appearances.

MR. LEVITT: That's correct.

THE COURT: You filed a notice of appearance, your partner filed a notice of appearance --

MR. LEVITT: Yes.

THE COURT: -- Mr. Richman filed a notice of appearance.

MR. LEVITT: That's absolutely so. And just in terms of the case itself, I believe that Mr. Richman and I will certainly have primary responsibility in court with Mr. Richman as lead counsel. I just wanted to clarify that, so the Court understood what the arrangement was.

THE COURT: Okay. Thank you.

MR. LEVITT: In terms of Mr. Ricco's participation in the case, may I respectfully suggest that the Court await the outcome of the disqualification motion before it decides whether or not to remove Mr. Ricco? Because, as you know, the government is seeking to disqualify Mr. Richman. This is a very complicated case. The main charge involves events that occurred 20 years ago, and I would note that from speaking with the government before court, in addition to all the other very substantial discovery we received, I understand that we're now about to receive discovery from more than a dozen electronic storage devices. And from my own experience, that kind of discovery can go into the multiterabyte area, which would be extremely, extremely time consuming reviewing those.

THE COURT: Well, I take it, Mr. Tortora, since he's paying for three attorneys, as it is, is always able to pay for Mr. Ricco as a retained attorney if he so chooses.

MR. LEVITT: I can't represent that that's not so. I just don't know, so I can't say. But I was just suggesting to the Court that it may want to defer that ruling until it rules on the disqualification motion.

THE COURT: I don't mind doing that. I don't think it would change my sense, but, also, it will provide an opportunity for Mr. Tortora to be here, in any event. So I won't decide that now, but it does seem to me that certainly

the firm of Levitt & Kaizer is well-known and excellent attorneys, and you're both onboard, as is Mr. Richman. It just seems to me that there's no entitlement to a CJA attorney in the form of Mr. Ricco, and I think this case -- that's the holding of the case, and that certainly the client, if he wishes to retain Mr. Ricco or anyone else, is able to. But we'll take a look at it, and I certainly understand what you mean about the electronic devices. I recently had a case like that where everybody was convincing me that in these electronic devices, there was more information than in certainly the libraries of Alexandria, and Babylonia, and the world as it's known. I don't think that really had an impact on how to proceed with the case, but I understand what you're saying.

I'm sorry, I didn't let the government weigh in here. It seems to me I don't have to make that decision right now.

MS. FENDER: We agree 100 percent, your Honor.

THE COURT: Okay.

So let's go to why we're here today. Why are we here today?

MS. FENDER: Your Honor, we're here, I think, for two primary reasons. One, I think the Court wanted to hear an update on the status of discovery --

THE COURT: I do, because the last time we were here, the government said you're going to move to disqualify Mr. Richman before December 13th, and, indeed, the government

did that on December 11th. Also, there was some talk about electronic devices, a return on a warrant for electronic devices. So fill me in on that.

MS. FENDER: Yes, your Honor.

It's not -- just to be clear, it's not just the electronic devices. I think where we were last time, your Honor, was the government understood and appreciated that the defense wanted a date to sort of pin their hopes to when discovery should be complete. So we worked very hard in the intervening period, since we were last before your Honor, on the arraignment for the superseder, to pin down all of the different elements that are in play and to give your Honor and the defense a reasonable estimate.

So just to back up a little bit and give everyone a sense of what we're talking about: We have quite a few things that are in play here. First of all, the electronic devices. Right now, there are about 28 or so devices that are being analyzed by CART with the FBI. We have talked with the defense, and they've agreed that they're going to provide us hard drives on a rolling basis, so that we can turn these around as quickly as possible. In other words, we don't have to wait to get the whole pot of 28 done, we're going to try to, every two weeks, be giving them back a hard drive that has whatever devices the CART team has been able to analyze.

But even with that, your Honor --

THE COURT: The CART team, what does CART stand for?

MS. FENDER: That's a very good question, your Honor. It is the FBI's electronics team. The acronym escapes me at this exact moment.

THE COURT: All right. C-A-R-T?

MS. FENDER: C-A-R-T, yes.

And they specifically focus on forensic imaging and searches of electronic devices.

So they are actively working on that.

In addition, we've uncovered VHS tapes and audio cassettes, old-fashioned audio cassettes, from Mr. Tortora's prior 2001 case in our old discovery that we're getting converted for the defense that's underway. We're working on compiling wiretap recordings and body recordings that relate to Mr. Tortora. So that's just some examples, your Honor, but having carefully looked at all these different categories, our estimate right now is that we need about six to eight weeks to complete discovery, but, at this point, we think all discovery will effectively be complete.

I will also note, your Honor, that we made an additional production Friday of last week, and, at this point, we have produced all of the discovery -- Rule 16 discovery relating to the homicide. So we are making very good progress given the volume of materials at issue here.

THE COURT: You mean the homicide in the original

indictment?

MS. FENDER: Yes, your Honor, the incident from 1997.

THE COURT: And you're going to do it on a rolling basis at least every two weeks?

MS. FENDER: That's specifically for the electronic devices, your Honor. And, yes, we're doing all discovery on a rolling basis, but that specifically is such a big chunk, we wanted to try to get it into defense's hands as quickly as possible.

We've already discussed this with the CART team, and they are onboard.

THE COURT: All right. Mr. Richman?

MR. RICHMAN: Yes, sir.

THE COURT: What's your response, if any? The government is seeking six to eight weeks. They say they're going to make rolling production, and that they've already made all the production that's relevant to the 1997 homicide.

MR. RICHMAN: We've had discussions concerning that prior to, and that's agreeable to us.

THE COURT: All right, fine. Let's take a look at eight weeks out.

MR. RICHMAN: We're talking about the middle or end of February, your Honor?

THE COURT: Well, I have eight weeks as February 1st or 8th. Let's take a look.

February 8th. You're saying February 15th, is that it?

MR. RICHMAN: That's a more likely, sir.

THE COURT: All right, fine. The last date for discovery -- the government is not going to object to that?

MS. FENDER: No, your Honor.

THE COURT: -- February 15th, 2019, and make the production as it's available.

Let's go now to the request for the disqualification.

Mr. Richman, did you want to respond to that in writing at some point?

MR. RICHMAN: Respectfully, yes.

THE COURT: I must say, it's quite strong. Obviously, there are always -- there are usually two views on these things. I'll take a look at your view, but it does look very strong.

When do you want to respond?

MR. LEVITT: Judge, if I may, I think three weeks from today would be fine.

THE COURT: All right.

January 4?

MR. LEVITT: That's fine, Judge.

THE COURT: That's over the holidays. You feel comfortable with that, sir?

MR. LEVITT: You know, I'm thinking as I'm speaking

quickly with my colleague here. If I could have an extra week, I think that would get us over the hump of the holidays.

THE COURT: Okay. I don't have an objection to that. January 11th.

MR. RICHMAN: Just be advised, your Honor -- I thank you, by the way, for giving me the day off yesterday because I was on trial for five weeks, and we got a verdict yesterday, but I will be starting another trial on the 4th of January, so --

THE COURT: Well, we're doing the motion to disqualify. The response is due January 11th.

MR. RICHMAN: Fine. Our response?

THE COURT: Yes. The opposition to the motion to disqualify is due January 11.

MR. RICHMAN: Very good.

THE COURT: All right.

We'll do a reply, if the government wishes, January 18th.

MS. FENDER: Thank you, your Honor.

THE COURT: I will then take a look at it, but, at a minimum, Mr. Richman -- I'm looking for the reference in the government's paper, I can't see it right now, but, at a minimum, if you were involved in the response to the subpoena that's now at issue in regard to whether or not there were surveillance tapes that were destroyed, and you represented or

represent a person who's going to be a witness at the trial in regard to the same thing, that presents a serious problem.

MR. RICHMAN: We will address that in the papers, your Honor, most respectfully.

THE COURT: No, I understand. I'm just telling you that it looks very strong.

MR. RICHMAN: I know, but I would ask you not to jump the gun.

THE COURT: I haven't. I never have, Mr. Richman.

MR. RICHMAN: I know.

THE COURT: Thank you.

Anything else?

MS. FENDER: Your Honor, I think we would ask for a date to come back and check in with your Honor after the motion is fully briefed. I don't know at that point if your Honor will want oral argument.

THE COURT: Well, I'll either request oral argument or bring you in for a decision. I think it makes sense to set something now rather than risk it falling between the stools.

Actually, I'm trying a case that following week, in the Western District of Pennsylvania, so let me set it down for mid-February.

Let's do it February 15th, which is the last day for discovery, so we will be able to take a look at that as well. Right now, I'll set it down for, we'll call it, an oral

argument on the motion to disqualify. 10:00 a.m., so we avoid the issue of transportation from the MDC. And the government will get me that letter, just so I better understand it in general.

MS. FENDER: We will, your Honor. We will endeavor to do that before a week's time.

THE COURT: All right. Anything else, government?

MS. FENDER: Yes, your Honor. Under the circumstances, the government would move to exclude time to February 15th. We're obviously discussing with counsel everything from alternative resolutions to making sure that they understand what's going on with the discovery, and so in the interests of justice, we would seek to exclude time to that date.

THE COURT: Defense?

MR. LEVITT: No objection, your Honor. Of course, there's a pending motion anyway, so that would stop it.

THE COURT: I was thinking about that, but let's go for belts-and-suspenders. The government has asked for an exclusion pursuant to (h)(7)(A), and the defense states they have no objection, so I'm going to grant the motion to exclude time from today until February 15th, pursuant to 18, United States Code, 3161(h)(7)(A). I exclude time from today until February 15th pursuant to that, (h)(7)(A). I do make the finding that the ends of justice outweigh the interests of the

public and the defendant in a speedy trial. The purpose is to enable the parties to attempt to resolve this consensually, if they so choose, or at least to discuss a possible disposition, and also for the discovery to take place, and for the parties to brief the motion that's already been made.

If there's nothing else, I'll see everyone on February 15th. Continue with your efforts to make the production.

MS. FENDER: Thank you, your Honor. One last final thing to put on the record. The government was hoping that, potentially today, we would set a trial date. Having discussed it with defense, they felt that that did not make sense, and we understand why. But we just wanted to alert the Court that when we come back in February, we are going to be asking for a trial date at that time, and we'll work with defense counsel to try to come up with some proposals that might work for the Court.

THE COURT: All right, fine. I appreciate that. No, I don't think it's appropriate I set a trial date now, but I think it does make sense in February.

All right. Thank you, all.

MS. FENDER: Thank you.

MR. RICHMAN: Thank you.

MR. LEVITT: Thank you, your Honor.

* * *