*LAW OFFICES OF*
# MURRAY RICHMAN
*and Associates*

2027 Williamsbridge Rd., Bronx, NY 10461
Tel (718) 892-8588 | Fax (718) 518-0674

February 11, 2019

**Via ECF**

Hon. Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

        Re: **U.S. v. John Tortora,**
            **18 Cr. 537 (SHS)**

Dear Judge Stein:

  I represent defendant John Tortora and submit this letter under 18 U.S.C. § 3142 (c) & (f) to ask the Court to set conditions of release to "reasonably assure the appearance" of Mr. Tortora at future court appearances and the safety of community. As we discuss further below, we propose that Mr. Tortora be released on a $5,000,000 bond, fully secured by the signatures of five persons and collateral valued at $5,016,000. This is Mr. Tortora's initial bail application. We respectfully ask that the Court schedule a hearing upon this application at its earliest convenience.

  We of course recognize that the principal charge against Mr. Tortora is the most serious – a 21-year-old murder – and that the government alleges that Mr. Tortora has organized crime connections. These circumstances, while surely relevant, are not disqualifying, either legally or factually, and have not prevented bail to be granted in other cases under equally or more aggravating circumstances, and notwithstanding the presumption embodied in 18 U.S.C. § 3142(e)(3)(C). (*See* discussion below).

  John Tortora was arrested August 2, 2018, on a three-count indictment charging a Racketeering Conspiracy in violation of 18 U.S.C. § 1962(d) (Count One); Murder in Aid of Racketeering in violation of 18 U.S.C. § 1959(a)) (Count Two) and Murder for Hire in violation of 18 U.S.C. § 1958(a)(Count Three).

  On November 14, 2018, a superseding indictment was filed, adding additional counts charging destruction of evidence in violation of 18 U.S.C. § 1519 (Count Four); Falsifying Records in violation of 18 U.S.C. § 1519 (Count Five) and Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512 (Count Six), all related to Tortora's

LAW OFFICES OF
# Murray Richman

Hon. Sidney H. Stein
February 11, 2019, Page -2-

alleged destruction of a surveillance recording the government sought by subpoena issued to the check cashing store Tortora managed. The murder alleged in the first two counts occurred in 1997 and was initially a death-eligible count, however, on November 20, 2018, the government agreed not to seek the death penalty against Mr. Tortora.

At arraignment, Magistrate Judge Gorenstein ordered that Mr. Tortora receive medical attention (Doc 7). Tortora is 62 years old and suffers myriad health issues, including diabetes, high cholesterol, asthma, and debilitation due to a stroke in 2013.

For the reasons that follow, we ask that Mr. Tortora be admitted to a $5,000,000 bond, fully secured by property posted by Mr. Tortora's family and friends, and whatever additional conditions the Court deems appropriate. He and his sureties will surrender their passports if he is admitted to bail.

## The Charges and Discovery

The government alleges that Mr. Tortora was an associate and then a member of the Genovese organized crime family (S-1 Indictment, ¶ 7) and participated in racketeering activities, including robbery, extortion, illegal gambling and ordering a 1997 murder.

Although discovery is ongoing, we have yet to see evidence concerning Mr. Tortora's involvement in any of the charged criminal conduct. This is not to say that no such evidence exists; the return of a grand jury indictment of course reflects the presumptive existence of such evidence. However, we note the paucity of supporting evidence in the discovery provided us is relevant to the required statutory analysis addressing the strength of the government's case.

Here, the sole count charging actual violence (and not imputed violence, *e.g.*, 18 U.S.C. §§ 892/894) concerns the 1997 murder of one Richard Ortiz, then involved in drug dealing and other criminality. The discovery provided thus far suggests that Ortiz was murdered by Abdel Saez, who was acting either alone or at the direction of another (Carmine Francomano) with whom he was criminally involved the evening of the murder. Saez was arrested the week after the November 11, 1997 murder but the charges were dismissed in 1998. In the ensuing 21 years, no one has suggested Mr. Tortora's involvement in this act. In thousands of pages of interviews we have reviewed so far, we have seen no witness statements connecting Tortora to this homicide except for the ex-wife of murderer Abdel Saez.[1]

---

[1] Karen Rivera, a drug abuser with a criminal record, was interviewed by agents more than ten times between 1997 and 2017. In 1997, she falsely reported that Saez was home with her at the time of the Ortiz murder (Government provided discovery: JT 3420, 4116). In 2009 and 2013, she reported that the Ortiz had owed money to someone and

LAW OFFICES OF
# Murray Richman

Hon. Sidney H. Stein
February 11, 2019, Page -3-

Other witness statements reflect that Ortiz was killed because of a dispute over drugs, money for drugs, or because Ortiz was an informant for the Yonkers police. Ortiz's mother also heard a rumor that her son had informed on an after-hours nightclub in Yonkers (having nothing to do with Tortora) that was raided and she suspected the people who were arrested sought revenge (JT 3465-3466).

Ortiz's ex-girlfriend told investigators that Ortiz had been locked in the trunk of a car several years earlier and that the assailants tossed gasoline on the car but it didn't ignite. The assailants were convicted and Ortiz obtained a several hundred-thousand-dollar judgment against them. The ex-girlfriend thought these men might have had something do with Ortiz's murder (JT 4110-4120). She also speculated the murder had something to do with Ortiz owing people money for drugs (JT 4122).

Another individual (W-22), who was in the County lock-up with Saez said that Saez admitted the murder and said that Carmine Francomano ordered Saez to commit the murder because Ortiz was a "snitch" and that Ortiz owed Francomano money for drugs (JT 4143-44). Another individual (W-42) who was in the bar the night of the murder, admitted that he had an argument with Ortiz ten days prior to the murder (JT 4165, 4167). Finally, another witness (W-43) had a physical altercation with Ortiz the summer preceding the murder but that it had been resolved (JT 4169).

Other discovery, not concerning the 1997 murder, reflects surveillance over a several year period, capturing Mr. Tortora meeting and speaking with others, but does not, from what we have seen, capture any obvious criminality. On February 5, 2019, your Honor granted the government's request to extend the discovery scheduled until March 15, 2019.

A massive amount of data has been produced by the government – perhaps a by-product of the fact that these charges date back to the 1990s – including photos, phone

---

that Carmine Francamano (who was present the night of the murder and with whom Saez was criminally involved) directed Saez to kill Ortiz. She also implicated herself in the murder cover-up by stating that she cleaned Saez's clothes with bleach after the murder to remove blood stains (JT 3421, 3423). In 2011, she told investigators Ortiz was killed because he owed money for drugs to Francamano. (JT 3426). In 2014, she told investigators that Saez killed Ortiz at the request of Francomano, having something to do with the Flamingo bar in Yonkers (JT 3427). In 2015, she told investigators, for the first time, that Ortiz was killed because he was stealing from slot machines at the Mill Bar (near where Ortiz was killed) (JT 3436). In 2017, she told investigators that she recalled various persons including a person named Tony talking about this killing before it occurred and that another witness (W-37, not Tortora) set it up and told Saez to kill Ortiz. She clarified that she didn't know whether it had something to do with drugs or slot machines. (JT 3443).

LAW  OFFICES  OF
# Murray Richman

Hon. Sidney H. Stein
February 11, 2019, Page -4-

records, telephone and informant audio and video recordings, over 50 witness statements spanning 20 years and other voluminous government records, some of which are difficult to decipher.

The government has marked much of the discovery confidential and we are unable to provide paper or electronic copies thereof to Mr. Tortora for review in his unit. An attorney from our office has spent two days in the MDC with Mr. Tortora discussing two of the five tranches of discovery thus far provided.[2] The gigabytes of data provided by the government was just too extensive for counsel and client to make any real headway during two several-hour attorney visits. It was agreed by counsel and client that Mr. Tortora needs to spend time on his own evaluating the mass of discovery so he can help us understand the significance of what was produced and assist in his own defense. In that regard, the government has produced the discovery for Mr. Tortora on a hard drive and forwarded that hard drive to the MDC for Mr. Tortora to review. However, Mr. Tortora has asked every week since October to view the electronically provided discovery in the law library – which is the only place he is allowed to review the material. He was told (and we have confirmed with MDC legal) that Mr. Tortora was allowed only three hours per week in the law library, on Wednesdays. Given these constraints, Mr. Tortora has thus far reviewed the discovery <u>for only two hours on one occasion,</u> despite his requesting an opportunity to do so every week since October (other than the week without power). Most weeks, including this week, he is told there is no discovery for him. We have asked MDC counsel whether we could preload a laptop computer with the discovery (as we have done in other cases) to permit Mr. Tortora greater access. We were informed that such a procedure is only employed as a last resort. Last month, we wrote to Ms. McFarland in MDC legal stating that we believed we were at the "last resort" stage of this issue and we proposed purchasing a laptop for Mr. Tortora to facilitate his review of the discovery. There has been no response to our repeated emails and phone calls to MDC legal. These restrictions have inhibited our ability to provide Mr. Tortora effective assistance of counsel and are a continuing problem we ask the Court to consider as part of this application.

### Bail Factors (18 U.S.C. § 3142(g))

Under the Bail Reform Act, a defendant may be detained pending trial only if the magistrate judge or district court judge determines "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any person and the community…" 18 U.S.C. § 3142(e)(1). Given the nature of the

---

[2]  Counsel has attempted other visits to the MDC but was informed that a lock-down precluded attorney on two other occasions, in December and January. We have just been informed that another tranche of discovery (the sixth) is waiting to be picked up at the United States Attorney's Office.

LAW OFFICES OF
# Murray Richman

Hon. Sidney H. Stein
February 11, 2019, Page -5-

charges, however, a rebuttable presumption against bail exists. 18 U.S.C. § 3142(e)(3)(C).

### Factors to be Considered Under § 3142(g) to Determine Release on Bond.

In determining if release conditions exist that will reasonably assure a person's appearance at trial, courts consider:

1. The nature and circumstances of the offense charged;

2. The weight of the evidence against the defendant;

3. The history and characteristics of the person, including the person's character, physical and mental condition, family ties, employment, community ties, financial resources and criminal history; and

4. The seriousness of the danger to any person or the community that would be posed by the defendant's release.

18 U.S.C. § 3142(g).

We suggest for the reasons that follow, including Mr. Tortora's history and characteristics, combined with the substantial bail package we offer, that the Court can be confident that he will in fact return to court when required and not pose a threat to the community.

1. <u>The nature and circumstances of the offense charged</u>. The charges are serious. Tortora is alleged to be a member of an organized crime family and to have been involved in the 1997 murder of Richard Ortiz, allegedly because Ortiz was breaking into Tortora's joker-poker machines. Other racketeering acts involve gambling, extortion and violations of Title 21. Mr. Tortora denies all the charges. Mr. Tortora, however, has never been convicted of any violent act or charged with involvement in drugs and denies any involvement in the murder of Richard Ortiz. The murder dates to 1997 and all discovery provided thus far, discussed above, reflects that a confederate of the victim stabbed him after a night of drinking and abusing drugs. Undoubtedly, the charge is serious, but stale, and appears to have little support in the discovery thus far provided.

2. <u>The weight of the evidence against the defendant</u>. The indictment is silent as to specific actions or conversations that Tortora may have had with anyone evidencing his involvement in the charged offenses. As noted above, the murder dates to 1997 and another was arrested for its commission at the time. Provided discovery reflects that several others had motives for killing Ortiz. There is no connection between Ortiz and Tortora save for the government's bare allegation that Tortora, some 22 years ago, asked

that Ortiz be killed because Ortiz was breaking into Tortora's joker-poker machines. The evidence, as thus far provided to us in discovery, is therefore far from damning and likely comes from cooperating witnesses who after 22 years have suddenly had an epiphany, no doubt to obtain some substantial benefit from the government.

3. The History and Characteristics of the Defendant.

   a. Roots in the Community. Mr. Tortora is a 62-year old U.S. citizen and life-long New Yorker. He has managed a check-cashing business and jewelry store in Yonkers since the early 1990s. He has owned his own home in Yonkers for many years and is presently going through divorce proceedings. He is the primary caretaker of his 23-year-old daughter who has experienced substantial medical and psychiatric issues for the past ten years. She has fared poorly since Mr. Tortora's arrest. She has run away from the relatives responsible for her care and has been hospitalized as recently as 2018 for depression and anorexia.

   b. Circumstances of Confinement and Review of Discovery. We have been barred from visiting Tortora on three separate occasions during December and January due to circumstances at the MDC prior to the fire. Of course, even attempting an attorney visit early February would have been futile. As noted above, Tortora has been able to access the confidential discovery on only a single occasion for two hours during the past four months. Such a circumstance is unacceptable. The discovery in this case is voluminous. Much of it dates from 1997 and 1998 and it is critical that Tortora have access to these records if he is expected to assist in his defense. We do not expect Tortora to be given any greater access to his discovery in the future than he has been in the past. We will effectively be required to visit with him (after obtaining special permission to bring our laptop into the MDC) every time he seeks to review his confidential discovery. An eminently reasonable solution would be Tortora's release on a fully secured bond, with permission to review discovery at home or at his counsel's office.

   c. Medical Issues and Treatment at the MDC. Tortora suffered a stroke in 2013 and has myriad health problems. He is asthmatic, diabetic and has a torn hip labrum. Prior to his arrest, his diabetes was controlled with Metformin but the food at the MDC has aggravated his diabetes and he is now prescribed insulin twice per day. Days have gone by with Tortora receiving none of his required medications and his sugar levels have fluctuated wildly. Prior to incarceration, Tortora was receiving regular cortisone injections for his torn hip labrum. His requests for treatment have largely gone unanswered and that it is a daily struggle to get out

LAW OFFICES OF
# Murray Richman

Hon. Sidney H. Stein
February 11, 2019, Page -7-

> of bed. Tortora also has issues with his blood pressure issues and asthma, which he reports are not under control in the MDC.
>
> Although the BOP's mantra is that it is fully capable of handling inmates with serious medical needs, the events of this past week reveal a different truth. *See* "It's Cold as Hell": Inside a Brooklyn Jail's Weeklong Collapse." New York Times, February 9, 2019 *https://www.nytimes.com/2019/02/09/nyregion/brooklyn-jail-no-heat-inmates.html;* and Huffington Post: MDC Brooklyn has Long Been a Frigid Hellhole…https://www.huffingtonpost.com/entry/mdc-brooklyn-conditions_us_5c59bb62e4b00187b5556cdf. Other detainees have been hospitalized only after the issuance of a court order permitting the inspection of the facility by the Federal Defenders along with the representative of the U.S. Attorney's Office. While it cannot be assured that Tortora will receive adequate medical care if he remains in pretrial detention, it is beyond question that if he were admitted to bail, he would receive required care.
>
> d. <u>Criminal History</u>. According to Mr. Tortora's arrest record, provided by the government, in 1984, Tortora was convicted of possession of a forged instrument and attempted possession of stolen property and sentenced to 90 days and five years' probation. He was discharged early from probation and issued a certificate of relief from civil disabilities. In 2003, Tortora was sentenced by Judge Robert Carter to two years' probation upon his plea to receipt of stolen property in violation of 18 U.S.C. § 659.

4. <u>Risk of Flight/Danger to the Community</u>. We acknowledge the serious nature of the 1997 murder; albeit one lacking any currency. Moreover, numerous defendants have been admitted to bail notwithstanding charges of murder, organized crime involvement and charges of obstructing justice; ultimately a defendant's bail eligibility requires a sensitive weighing of the statutory factors and the collateral the defendant offers to secure the bond.

It is simply unrealistic to conclude that if a significant bond were posted and Mr. Tortora were subject to GPS monitoring, he would pose an unacceptable risk of flight. Pretrial flight is exceedingly rare in this post 9/11 world where international borders are not so elastic and even domestic travel is subject to strict identity monitoring. Even if Mr. Tortora had the means and opportunity to flee, he would never risk the loss of his friends' and family's equities in their homes. Tortora's main concern is his ailing 23-year old daughter, who suffers from physical and psychological issues and, of course, a fair opportunity to prepare his defense and address his continuing health problems.

Tortora is a lifelong New Yorker and resident of Yonkers. His entire family, including his brother, sister and daughter are here. His roots are here. When arrested, he

LAW OFFICES OF
# Murray Richman

Hon. Sidney H. Stein
February 11, 2019, Page -8-

was beginning to resume his managerial duties at the check-cashing and jewelry store after a 2013 stroke nearly killed him.

In sum, Mr. Tortora:

- has had no criminal contacts since his 2003 misdemeanor conviction;
- has strong family ties, a residence and strong roots in the community;
- has no history of drug or alcohol abuse; and
- has never disobeyed an order or any court.

18 U.S.C. § 3142(g)(3).

Courts have granted bail even when defendants have been charged with crimes of violence or membership in a criminal organization. *See United States v. Gigante*, 85 F.3d 83, 84 (2d Cir. 1996) (noting that Judge Nickerson set bail for the alleged "boss" of the Genovese crime family). *United States v. Russo*, 92 Cr. 529 (S.D.N.Y. 1992) (Cedarbaum, J.) (releasing alleged captain in a Mafia family); *United States v. Enix*, 209 F.Supp.3d 557 (W.D.N.Y. 2016) (release on $500,000 bond granted where defendant charged under RICO with murder, robbery, kidnapping, drug trafficking, and obstruction of justice). In *Enix*, the Court focused on the paucity and circumstantial nature of the evidence concerning defendant's involvement in the charged murder. *Enix*, 209 F.Supp.3d at 569–70; *United States v. Torres-Rosario*, 600 F.Supp.2d 327, 332 (D. Puerto Rico 2009)(Defendant charged with capital offenses, including murder, rebutted presumption that no conditions of release would assure his appearance and the safety of others, and thus, was entitled to release from pretrial detention, finding the evidence against the defendant was weak).

There are numerous unreported cases where bail was granted despite allegations of violence of membership in a criminal organization. *See,*

- *United States v. Neil Messina,,* 11 Cr. 31 (KAM) (EDNY), Judge Matsumoto affirms Magistrate's decision and releases alleged Bonnano associate on $3.6 Iilillion bond, despite charges including 1992 murder;

- *United States v. Onofrio Modica,* 09 Cr. 1243 (SDNY), Judge Lewis Kaplan releases alleged Gambino soldier on $2 million bond, despite charge of 1987 double murder;

- *United States v. Carmine Polito,* 02 Cr. 47 (EDNY), Judge I. Leo Glasser affirms Magistrate's decision granting release on $2 million bond for alleged Genovese associate charged with murder in aid of racketeering and facing the death penalty.

LAW OFFICES OF
# Murray Richman

Hon. Sidney H. Stein
February 11, 2019, Page -9-

- *United States v. Steven Crea, Jr.*, 17 cr. 89 (CS) alleged captain in Lucchese family released on $1 million bond where charged with murder in aid of racketeering;

Mindful of the organized crime allegation in this case, other noteworthy alleged organized crime defendants, who were released on bail despite government requests for detention, include Stephen Caracappa and Lollis Eppolito ("the Mafia capo), John "Sonny" Franzese, Vincent "the Chin" Gigante, Anthony Spero. Salvatore Vitale, John "Jackie" DeRoss, James "Jimmy Brown" Failla, John Gotti, Jr., Richard Gotti Sr., and Thomas Gambino, to name but a few.

Given that the charged murder occurred in 1997, the wildly divergent theories concerning those responsible for the murder and the lack of direct, credible evidence implicating Mr. Tortora in this offense, the Court should find that the $5,000,000 secured bond proffered below successfully rebuts the statutory presumption against bail.

### Proposed Bail Package

Based on the foregoing, we propose that Mr. Tortora be admitted to bail upon the following conditions:

- A five million ($5,000,000) dollar bond fully secured by five financially responsible persons among Mr. Tortora's friends and family;
- Collateral totaling $5,016,000;
- Surrender of travel documents for him and his family;
- GPS monitoring;
- Such other conditions the Court deems appropriate.

Those willing to sign a surety bond securing Mr. Tortora's release are:

1. **John Naples** (DOB 1-8-58, SS 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) is a friend of Mr. Tortora since 2007.[3] He resides at 1009 Ocean Avenue, Unit One in Bradley Beach, NJ 07720 (two-family duplex on the ocean). Mr. Naples is life-long real estate investor and builder. In 2017, Naples bought the above empty lot from a synagogue and built the two-family ocean-front home where he resides. He resides in half the unit and rents out the other half. It is a unique property and he estimates its value at **2.5 million dollars** with a balloon mortgage of **$1,000,000** payable to the synagogue. **His approximate equity in this property is therefore one and one half million ($1,500,000) dollars.**

---

[3] An unredacted version of this letter and supporting documents have been provided to the government.

Naples owns another property that was his primary residence until he built his current home. It is located at 506B Ocean Blvd., also in Bradley Beach, NJ and is worth **1.8 million dollars with a $525,000 existing mortgage**. His equity in this property is therefore approximately **$1,275,000.**

Altogether, Mr. Naples is willing to post approximately **$2,775,000** in real property equity to support Mr. Tortora's release on bond.

2. **Anthony Tortora** (DOB 2/4/56, SS 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) and **Christine Tortora** (DOB 11/4/57, SS 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) own their own home. Anthony is John's brother and lives with his wife and daughter at 304 Douglas Road, Chappaqua, NY 10514. The home was purchased for $150,000 in 1994. It is worth approximately $1,200,000 with a $35,000 home equity loan, yielding equity of approximately **$1,165,000**. Anthony is a Business Agent/Organizer since 1981 for Teamsters Local 456, representing Westchester County municipalities. He currently earns $137,000 per year. His wife is a homemaker.

3. John's sister, **Donna Tortora**, (DOB 10/19/59, SS # 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) owns a home located at 29 Senior Avenue, in Mahopac, NY. It is valued at $400,000 with a $95,000 home equity loan. She has owned it for approximately 20 years and is retired as teacher's aide. She therefore has approximately **$305,000** in equity in this property. She recently added her 30-year old son, Thomas Shost, to the deed (in furtherance of estate planning). They are both willing to sign a confession posting this property as collateral

4. **Natalie Santoro** (DOB 6-3-64, SS # 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), John's first cousin has a Master's Degree in social work from Fordham University and is the owner of five Dunkin Doughnut stores in Westchester, along with her brother, Paul Santoro. She earned $264,000 last year. She is a single mother, living with two children, ages 8 and 4, at 32 Balmoral Crescent in White Plains. She purchased her home 6 years ago for $500,000. The home is valued at $525,000 and she maintains a mortgage balance of approximately $342,000. Her equity in the property is approximately **$183,000**. She co-owns the home with her brother (since he co-signed the mortgage when she bought the property) and he will sign onto any required confession of judgment to secure the property.

Natalie Santoro is also the owner of 108 Drisler Avenue in White Plains, which is held in the Natalie Santoro Trust. It was her mother's property, is valued at **$588,000** and has no mortgage. She is willing and able (under the terms of the trust) to post this property as security for Mr. Tortora's bail.

The total equity in the six properties proffered is therefore **$5,016,000.**

LAW OFFICES OF
## Murray Richman

Hon. Sidney H. Stein
February 11, 2019, Page -11-

*****

    We stand prepared to provide any additional information required by the Court to fully consider this proposal and respectfully request a hearing upon this application.

                                                   Respectfully submitted,

                                                   Murray Richman

cc:     AUSA Jessica Fender